Okay, our third case of the day is Hunter v. Mueske. Mr. Cade. Good morning, your honor. I may please the court. Nate Cade for the appellant, Michael Hunter. Michael Hunter wrote a notice to the security officer, the director. Please move me. My cellie is always mad at me. Keep threatening me. I fear for my life. When a prison official knows that an inmate faces a substantial risk of serious harm, the Eighth Amendment requires that the official take reasonable measures to abate the risk. But that wasn't the only note that Mr. Hunter wrote. He actually had written a note beforehand saying, me and my cellie are not getting along. It is like walking on eggshell. Please help. The district court and the state of Wisconsin, the two officials, took that as, well, that's not true. That's concrete. And in fact, this court previously wrote in the Jabez case that walking on eggshells, and when you describe who the potential person is who's threatening you, is enough. That requires the official to act. In this case, the official did not act. There is the- Nate Cade Can you tell me, I was going through the record, and it wasn't quite clear to me, given the factual assertions that defendants were making in the district court and Mr. Hunter's responses at summary judgment. So does Mr. Hunter agree with the proposition that he and Ms. Musk did have a conversation, albeit whether in her office or otherwise, after those notices were sent where he explained to her the problems that he was encountering? Nate Cade No, Your Honor. He had, the way it works is this unit, there are, it was, I've seen 120 and 160 men. There's some number of men on this particular age unit. So Ms. Muskie is the security director. So she just walks up and down. People will stop her. Hey, Ms. Muskie, can you help me? So Hunter says, I stopped her, and he's had conversations with her. And one of her statements was, if I can't read it, I throw it away. So Hunter says, the next time that I write it, I'm making sure that I'm trying to spell it out as neatly as I can so you read it. So he says, yes, we had conversations, but we never had this conversation. And her response was, I'm not going to interview you, and I don't do roommate requests. So the conversation I'm referring to is, I think Ms. Muskie states that she had a and that she told him that it would be addressed in one way or another. So Mr. Hunter's position is they never had a conversation regarding that topic. Not that specific conversation, no, Your Honor. He stopped her. Hey, Ms. Muskie, I'm, and actually in our brief, we cited, you told me, he wrote another note, that if you can't read these statements, you throw them away. It has nothing to do with, you know, no response. So getting back to the Jabez case, walking on eggshells and please help, threatening to kill me or threatening to harm me, is more than enough to give notice that something should be done. No investigation took place. Ms. Muskie doesn't say that she turned around and she asked the other sergeants or the other guards, did you notice anything? Have you seen anything? Can you guys even keep a lookout for anything? She just wrote back saying, I don't do roommate requests. The other issue that I take is the district court seemed to suggest, based on the video that was submitted to the court, well, Hunter must have said something to provoke. Nowhere in any of the cases cited does it ever suggest that if one inmate says, hey, I've got someone threatening to kill me, and they respond or say something to them, well, you brought it upon yourself. It's now your fault. That's blaming. Counsel, I would appreciate it if you would address what I have understood to be the district court's reasoning, which is that the decisions of these guards did not cause the beating. It wasn't simply the lapse of time. It is the beating occurred after the two were to be separated. That is the very relief that the plaintiff said should have happened earlier. And it happened not in the cell, but in a common room. How does one tie the failure to separate at time T to a beating in a common room seven months later that occurs when the two are to be separated? Well, I'll answer the second part first, Judge, because you're incorrect. Literally, Patterson was in his cell when you watched that video. Patterson comes out as Hunter comes in. So he literally, it's outside of their cell. It's not as if it's some other area. It's right outside the cell. Second, with regards to the causation, it's no different, Judge, than if you had a case where someone says, hey, we've got a number of cases where there's a threat of rape, and there's a time period. Well, if we had separated them, and I moved that one cellmate to a different cell, the rape would never have occurred. That's not necessarily true. The beating still took place. And the reason the beating took place is Patterson said, I don't like the way you're snoring, you're making noise, you're giving off gas, whatever, being in the cell. Had they been in a different cell, that would be a different issue. But then, Judge Easterbrook, if they had moved them, then at least they would have done something, which is what deliberate indifference requires. It doesn't have to be perfect. If they had moved them, and Patterson still beat him up, Hunter would have no claim because they at least attempted something. Here, we have no attempt whatsoever. But getting back to Judge Easterbrook's question, Hunter was the one that approached Patterson, right? So Hunter, as I see the record, Patterson was about to be moved. He gets up, is at the entrance of the cell. Hunter is somewhere else in the common room, and then he decides to approach Patterson to basically wish him goodbye. And so if Hunter had been relocated in another cell, and he was out of a cell in the common room, he still would have been moved to another cell. So, again, wasn't Patterson's actions caused by Hunter's decision to approach Patterson? I disagree, Judge Lee. If Hunter had been in another cell, there would have been no reason for him to approach, months later, Patterson to say, see you later. Because the whole point of moving to a cell, Patterson wasn't being moved to another cell, he was being moved to another wing. And the different wings all have different provisions and responsibilities and privileges. So it wasn't as if he's moving to the next cell, okay, see you later. Patterson was being moved off of H to really a more difficult area. And as testified by the non-party officer, the cell or the wing that he was being moved to was a wing where he had a lot more problematic individuals, a lot more people in for So when Hunter approached him, it was more of, hey, no hard feelings, and that's where the fight started. But how is that any different than if you have a bully and you say to the bully, if the school separates and we're gonna put you in different classrooms, hey, no hard feelings, and the bully punches you. You didn't ask to be hit because you extended your hand to say no hard feelings, I'm not mad at you. Don't you also have Patterson's statements, according to Hunter, that the cause of Patterson's move to this more restrictive wing. Correct. Patterson was never informed as to why he was being moved. He was just told pack up your stuff. So he literally had his stuff on whatever cart or whatever being moved out. That's all he knew was you were being moved. So he assumed Hunter is the basis or the reason for it, nothing else. Which is a link then to their status as I see I'm getting low on time. Two other points I want to make. The state seems to suggest, well, Hunter could have turned around and asked for SPN, special protective needs. Well, I have the handbook, and the handbook is in the record, and there's only one mention of special protective need. And it just says for special protective needs, it doesn't explain what it is, doesn't explain what occurs, it just says you have to see the first level for chain of command, see the security supervisor, and the second is security director. That's Ms. Muskie. Second, they say, well, you could have asked for protective placement. Except protective placement turns around and it's actually punishment. Because under the rules, when you go into protective placement, you lose your rights to earn compensation, you lose the right to earn a job. So Hunter would be the one penalized. And this court has previously said that is not a solution when you turn around and be punished. I see I'm low on time. I'll reserve my final 20 seconds. Certainly, counsel. Ms. Lodol. Good morning, and may it please the court. Assistant Attorney General Lynn Lodol from the Wisconsin Department of Justice, representing the Appalachians in this case. The critical dispositive flaw in Mr. Hunter's claims is the lack of causal connection between the alleged constitutional violations and the injuries that he suffered in the fight. At best, Hunter can establish that he asked the unit supervisor three times for a new cell assignment because he and his cellmate Patterson were not getting along. And on the last occasion, on April 12, 2017, he added a warning that Patterson was always mad at him, was threatening, and he thought he might be unsafe. He wanted a new cellmate because he felt unsafe being housed with Patterson. And eight months later, Hunter and Patterson did get in a fight, but it was not because they were housed together. The fight occurred, as this, as counsel has indicated, when Hunter voluntarily approached Patterson outside of the confines of a cell in a common area after they were no longer cellmates. So this is a different situation. Is it fair to say that, you know, this is after they were no longer cellmates? This is literally the moment where Patterson is being told, pack up your belongings and remove yourself from the cell that you do share with Hunter. And does your argument ignore the evidence in the record, at least from Hunter, which the Patterson linked his order to move to the fact that Hunter was his cellmate and must have ratted him out and gotten him moved? No, Your Honor. Our argument does not ignore that. The critical fact is that Hunter had asked for a new cellmate. The issue was his, the cohabitation with Patterson. And on the day of the fight, he had gained the ability to avoid interactions with him. I actually have that question as well. Sure. Hunter, you all do claim that Hunter receives everything he asked for because Patterson was then moved. But didn't Hunter ask that he be moved? He be moved from the cell. And if that request had been granted, then a reasonable jury could infer that Patterson would have no reason to suspect that Hunter snitched on him and would not have attacked Hunter as a result. In other words, what Hunter asked for is that he be moved. He didn't ask that Patterson be moved. And that can engender, a jury can infer, a very different reaction on Patterson's part. If Hunter had been moved months earlier, then the attack may not have happened. A reasonable jury can see it that way. I don't think so, Your Honor. A full look at the record shows it wasn't just that he testified in his deposition that after they first started to not get along in March of 2017, that he and Patterson went together to the unit, I guess, the sergeant that was on duty, and they both, they explained, we need to be separated. We're not getting along. And I don't think that just the fact that Patterson, you know, thought he may be moving because of Hunter gives enough, there's not enough evidence in the record to support an inference that there's a connection here. Because, you know, Hunter's complaint was that, like we've discussed, he wanted a new cellmate. And it's a different situation to then have a fight in a common area. So, you know, they could have been playing checkers weeks later. Do you acknowledge that the fight started in the cell and pushed him out of the cell and pushed him into the day room? The video evidence shows Hunter approaching the open cell through a common area. And they were talking basically in the door of their cell. You actually can't see that from the video. We looked at the video. I'm not sure if it matters whether the conversation started in the cell, the fight happened outside of the cell, and Hunter did not have to approach him at all to initiate this conversation that, for whatever reason, ended in a fight. I'll also add that beyond this issue of causation where Hunter's warning to the prison officials does not match the injury that happened, his claim against Supervisor Muski also fails because the threat that he communicated to her, regardless of whether it was credible or sufficiently specific, it wasn't imminent because, again, this warning that he gave her was in April 2017. Eight months passed and nothing happened. And when the fight did occur in December of 2017, it was in an entirely different context than the circumstances that he had complained about. You know, I could see that in a case between two people where we don't have the testimony about Patterson's personality that we do here, but we do have evidence from Hunter and also from Wilcox that Patterson was an on-and-off, hot-and-cold kind of guy. They'd get along one day, they'd be at each other's throats another day. That ties into Hunter's description of walking on eggshells. One day I'm okay with this guy, and the other day I'm feeling very threatened. Does that make the record slightly different from a mine run case where people have a disagreement in April, so there's definitely no link or causation in December? No, Your Honor. So the information in the record showing that Patterson was generally, you know, a hot-and-cold kind of person, maybe prone to violent outbursts, all of that goes to I mean, the question is what the defendants knew, whether they knew of an actual risk to Hunter's safety. And information about Patterson's disposition can really only be relevant if it was so obvious that they should have known, or not just should have known, but knew that Patterson was going to harm him. And there's nothing in the record that rises to that level. I hope that answered your question. I do want to point out that, you know, over the past decade, this Court has issued a number of decisions where they did find potential liability under a failure to protect theory. And in those cases, I'm thinking in particular of Jivas v. McLaughlin and Labreck, a case that both parties talked about extensively in their brief, there's a fact pattern where an inmate describes a specific threat to his safety, nothing is done, and a short time later, the threat materializes. And this case is just not consistent with that type of fact pattern. Let me ask you this. Did the District Court misapply the summary judgment standard when it inferred from the surveillance video that had no audio and that was partially obscured? You cannot see the beginning of the fight, so you cannot see it. You cannot hear the beginning of the fight. That Hunter must have said something to Patterson that provoked the attack. Your Honor, my reading of the District Court's reasoning on that point was not that the injuries were Hunter's fault because he must have provoked the fight, but rather, the key is that he initiated the conversation that, for whatever reason, resulted in a fight. So they use the word provoke, but I believe the point is the fact that Hunter initiated the interaction. The District Court says, but whatever Hunter said provoked Patterson, resulting in the beating. Correct. And the conversation, Hunter said something to Patterson because he voluntarily went to him to initiate this conversation after he was no longer his cellmate and no longer needed to have these types of conversations. Counsel, can I ask? Sure. I'm sorry, are you done addressing the question? I am, Your Honor. Can I ask you this? Let's say, hypothetically, that Ms. Muskie did grant Hunter his wish. And I know the parties, it's undisputed that that's not what caused the scheduling of Patterson's move. But let's assume that it did, that Muskie said, you know what, Hunter, I see your point, I'm going to move Patterson. The correctional officers come in to get Patterson. Patterson looks at Hunter and says, it's your fault I'm being moved, and then beats Hunter. Okay. Would Hunter have a claim of proximate cause in that situation, or would he not? I think he certainly gets a lot closer there because in that situation, the injury matches the warning, right? They fought in their cell because they were cellmates, and he's trapped there. Is there anything that Ms. Muskie could have done to prevent that from happening? I don't think so, Your Honor. No. If there are no further questions, Your Honor, I will conclude my presentation and just respectfully ask this court to affirm the district court's summary judgment decision. Thank you. Thank you. Mr. Cade. Thank you, Your Honor. I will increase your 20 seconds to 60. Thank you, Your Honor. I appreciate that. At the end of the day, when you say my roommate is threatening to kill me, I fear for my life, nothing else can put the defendants or correctional official on notice. Mr. Cade, let me give you the same hypothetical I gave to Ms. Lodol. So let's say, Ms. Muskie did grant Mr. Hunter's request, and so as a result, the correctional officers came to their cell to move Mr. Patterson or Mr. Hunter, exactly what Mr. Hunter requested. And Mr. Patterson goes to Mr. Hunter and says, you know what? I like the cell. I can't believe you're making me move, and punches him, okay? Do you believe in that scenario that there's a punch? I think what she could have done is when they came to the cell, she could have instructed the security officials to make sure that Hunter was not there, so the punch could not have taken place, so that they weren't in relationship to each other. But again, I think you're hitting the crux, is Ms. Muskie did nothing. She didn't do anything. She just said, I don't do roommate requests. I've been doing this for a few years, and I've never seen a corrections official be so yeah, whatever. Now you're just fighting the hypothetical, but I get your point. But at the end of the day, we would ask that the court overturn the district court. We believe that they misapplied summary judgment and held it against Hunter. It should go to a jury to decide the credibility issues. Thank you. Thank you, counsel. The case is taken under advisement.